1  **CASEY, GERRY, SCHENK,**
   **FRANCAVILLA, BLATT & PENFIELD**
2  110 Laurel Street
   San Diego, CA 92101
3  Telephone:     (619) 238-1811
   Facsimile:     (619) 544-9232
4  **Gayle M. Blatt, Esq. - SBN 122048**

5  **HEYGOOD ORR & PEARSON**
   2331 W. Northwest Hwy., 2nd Floor
6  Dallas, TX 75220
   Telephone: (214) 237-9001
7  Facsimile: (214) 237-9002
8  **Michael Heygood (admitted *pro hac vice*)**
   **michael@hop-law.com**
9  **Charles Miller (admitted *pro hac vice*)**
   **charles@hop-law.com**
10 **James Craig Orr, Jr. (admitted *pro hac vice*)**
11 **jim@hop-law.com**

12 Attorneys for Plaintiffs

13                UNITED STATES DISTRICT COURT
14
              SOUTHERN DISTRICT OF CALIFORNIA
15

16

17 WALTER RICHARDSON, MICHELLE          Case No.:  09-cv1041-JM (BLM)
   REMERAZ, SAM BLOOM, CHRISS
18 BLOOM, and STEPHANIE LEEWRIGHT,
                                        **EXHIBITS TO PLAINTIFFS'**
19       Plaintiffs,                    **OPPOSITION TO DEFENDANTS'**
                                        **MOTION IN LIMINE NO. 4 TO**
20       v.                             **PRECLUDE EVIDENCE OF OTHER**
                                        **LITIGATION COMPLAINTS**
21 MYLAN, INC., MYLAN                   **INVOLVING THE MYLAN FENTANYL**
   PHARMACEUTICALS, INC., MYLAN         **TRANSDERMAL SYSTEM;**
22 TECHNOLOGIES, INC., and JOHN DOES    **MEMORANDUM OF POINTS AND**
   1-100                                **AUTHORITIES IN SUPPORT**
23
         Defendants.                    Date:  **October 29, 2010**
24                                      Time:  **1:30 pm**.
                                        Courtroom: **Dept. 16**
25

26  _____

27

28
                       TABLE OF CONTENTS

1

Exhibit 1 - Expert Report of Mario Gonzalez, Ph.D          Page 1

Exhibit 2 - Expert Report of Nicholas Fleischer          Page 17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER RICHARDSON, MICHAEL REMERAZ, SAM BLOOM, CHRISS BLOOM, and STEPHANIE LEEWRIGHT, | CASE NO.  09cv1041 JM (BLM) |
| Plaintiffs, | (Removed from Superior Court, County of San Diego, Case No. 37-2009-00084771-CU-PL-CTL) |
| vs. | |
| MYLAN, INC., MYLAN PHARMACEUTICALS, INC., MYLAN TECHNOLOGIES, INC., and DOES 1-100, | |
| Defendants. | |

## EXPERT WITNESS REPORT OF MARIO A. GONZÁLEZ, Ph.D.

I, Mario A. González, Ph.D., hereby state that the contents of this report are based upon my extensive training and experience in biopharmaceutics, pharmaceutics, pharmacology, pharmacokinetics and I have concentrated on the pharmacokinetic and pharmacodynamic evaluation of extended-release oral and transdermal drug delivery systems[1]. The opinions set forth herein are expressed with reasonable medical and/or scientific certainty or probability.

### I. DIRECTIVE

I was asked to look into the questions set forth below and hereby provide my short form answer to the same, which will be more fully addressed elsewhere in this report:

1.  Whether the fentanyl transdermal system (FTS) as manufactured by Mylan Technologies Inc. and approved by the Food and Drug Administration (FDA) on January 28, 2005 is safe and effective when used as directed and as approved by the FDA?
    <u>Answer</u>: Yes.

2.  Whether the design of FTS is defective and/or in any way caused or contributed to Sandra Richardson's death?
    <u>Answer</u>: No.

---

[1] A detailed description of my education, expertise, experience, research and publications may be found in the curriculum vitae attached hereto as **Exhibit A.**  A copy of my testimonial history over the last five (5) years may be found in the document attached hereto as **Exhibit B.**

2

## II. COMPENSATION

I am being compensated for the time I spend consulting in this matter at my customary rate of $500 per hour for consulting activities and for testifying at a deposition or trial. My compensation is not dependent on the outcome of the case.

## III. INFORMATION CONSIDERED IN FORMING OPINIONS

In preparing this report, I reviewed:

- Citizen Petitions submitted to the FDA regarding fentanyl transdermal products, including FTS and Duragesic®;

- Deposition of Robert Gale taken on February 8, 2008;

- Abbreviated New Drug Application (ANDA) submitted by Mylan to the FDA regarding FTS;

- Formulation Development Reports for FTS;

- FDA Approval Package (formerly known as the Summary Basis of Approval) for Duragesic® New Drug Application (NDA) 19813;

- "Bioavailability and Bioequivalence Studies for Orally Administered Drug Products - General Considerations" July 2003 FDA DRAFT GUIDANCE;

- Deposition of William E. Brochu taken on October 23, 2009;

- Deposition of Michael Houghton taken on October 20, 2009;

- La Mesa Police Department Records related to Sandra Richardson; Case No. 09-cv1041-JM

- Medical Records related to Sandra Richardson;

- Kaiser Foundation Hospital Records related to Sandra Richardson;

- NMS Labs Litigation Package;

- Deposition of Walter Richardson taken on December 9, 2009;

- Deposition of Michelle Remeraz taken on December 9, 2009;

- Deposition of Christopher Bloom taken on December 10, 2009;

2

- Deposition of Stephanie Leewright taken on December 10, 2009;

- Deposition of Sam Bloom taken on December 9, 2009;

- Duragesic® Prescribing Information (P.I.) © Janssen 2002; and

- Complaint

## IV.   OPINIONS

It is my considered opinion, to a reasonable degree of medical/scientific certainty/probability that:

General

- FTS is safe and effective when used as directed in the official "Prescribing Information" and "Instructions to the Patient" and as approved by the FDA;

- FTS and Duragesic® are bioequivalent;

- FTS and Duragesic® employ different formulations;

- As designed, FTS cannot release more drug than it is designed to release when used as directed and approved by the FDA;

- FTS is superior to alternative fentanyl transdermal designs, including Duragesic®; and

- The FDA approved labeling for FTS adequately addresses how FTS works, how it should be used, as well as the safety concerns associated with the product.

- The FDA approved labeling for FTS and Duragesic® is unambiguous and specifies among other things:

1. The patch should be applied to non-irritated and non-irradiated skin.

2. The patient should not use lotions, alcohol, or any other agents that might irritate the skin or alter its characteristics.

3. The patient should allow the skin to dry completely prior to system application.

4. The patient should not put the patch on skin that is very oily, burned, broken out, cut, irritated, or damaged in any way.

5. A new patch should be applied to a different skin site after removal of the previous transdermal system.

3

<u>Specific</u>

- There is no evidence that the FTS patch worn by Sandra Richardson failed to operate as designed

## V.  BASES FOR MY OPINIONS

<u>Background</u>

*Statement of facts known and relied upon*

This case involves a death allegedly associated with use of a 100 mcg/h FTS patch. While under the care of different physicians at Kaiser Permanente in San Diego, Sandra Richardson received prescriptions for fentanyl containing products, including FTS.  Fentanyl patches were prescribed at a 72-hour dosing interval, and she was first prescribed the 75 mcg/h patch on or about July 25, 2006.  The prescription was later changed to 100 mcg/h, since Ms Richardson asked for an increase in dose to help with her pain.  While not clear, it appears that the fentanyl dose was increased to 100 mcg/h on August 21, 2006.

Sandra Richardson suffered from asthma, COPD, sleep apnea, hypertension, hyperlipidemia, GERD, an enlarged liver, attention deficit disorder, anxiety, and depression (self mutilating).  She was quite obese with recorded weights ranging from 248 lbs to 266 lbs. [Medical Chronology (8/31/1998 to 9/10/2002)].  She complained about chronic knee pain as well as back pain and was unable to work.  Her physicians constantly encouraged her to lose weight.

Sandra Richardson was a long-term user of pain medication and had used Lortab®, Vicodin® as well as the extra strength product, Vicodin ES® since at least 8/17/2000.  She continued using Vicodin® or the generic equivalent although she had been prescribed the fentanyl patch.  Her last refill for Vicodin® was on March 3, 2007; she died on March 10, 2007. Her overuse of narcotics is exemplified by an entry into the Kaiser Permanente records on June 16, 2005; she was taking 4-6 Lortab® tablets per day. On December 12, 2005, Dr. Jeffrey Krebs made an entry into her records that she had gotten Vicodin® refills on November 11, November 28, and December 6, 2005 from three different physicians.  Her use of diazepam also was above the prescribed doses.

In addition to the chronic use of alcohol, Sandra Richardson was taking many medications at or near the time of her death, including transdermal fentanyl, Nor-QD®, amoxicillin, dicloxacillin, gabapentin, Vicodin®, methocarbamol, Wellbutrin®, diazepam, and dextroamphetamine.  While not recorded among her medicines, she must have been taking diphenhydramine also, since her toxicology/autopsy report listed this drug.  At autopsy, it was discovered that Sandra Richardson suffered from hepato-splenomegaly (enlarged liver and spleen) as well as gall stones.  The toxicology results from the peripheral blood samples performed post-death revealed levels of fentanyl, diphenhydramine, amphetamine, diazepam, nordiazepam, gabapentin, bupropion,.  A urine screen also detected methocarbamol, doxepine,

4

5

and hydrocodone. The FTS allegedly worn by Sandra Richardson at the time of her death was not recovered.

From the photos in the La Mesa Police report, a bottle of moisturizing lotion (Nivea®) can be seen in what appears to be a cabinet in her bathroom or bedroom. If Ms. Richardson used this lotion on the site of patch application this would have been a way of increasing her fentanyl dose by increasing the penetration of fentanyl through the stratum corneum. The labeling of FTS clearly warns against this practice. Further, Ms. Richardson's chronic use of alcohol including on the night before she died is a practice that is contraindicated in the FTS labeling.

*FTS Design and Approval*

FTS uses a monolithic matrix design in which fentanyl is found in a single layer of contact adhesive sandwiched between a backing layer and a release liner. There is no alcohol and no gel. FTS maintains a continuous fentanyl delivery from the patch over the full 72-hour course of patch wear. Simply put, FTS employs a carefully designed and safe formulation.

FTS was approved for use in the United States on January 28, 2005. Such approval was based on a determination by the Food and Drug Administration (FDA) that FTS was bioequivalent to Duragesic®. The scientific community at large appears to have embraced the matrix design of FTS as the safest available design. This is evidenced by the increased use of the matrix design by other transdermal companies including Johnson and Johnson as more specifically described below in this report.

<u>FTS is Safe and Effective When Used as Directed</u>

FTS is a beneficial medication that is safe and effective when used properly and in strict accordance with prescribing guidelines. Fentanyl delivered transdermally is a blessing to many people suffering from moderate to severe, unyielding chronic pain, including terminal illnesses such as cancer. Transdermal delivery of fentanyl allows some of those who use it to return to the work force, or at least lead a more active life.

When used as directed, FTS is incapable of leaking or otherwise failing in a manner that would allow fentanyl to be delivered at a rate other than that which it is designed to deliver. It is true that FTS contains a potent and dangerous drug. However, the FTS delivery system is inherently safe and effective when used in accordance with the precautions set forth in the prescribing information. Some of the precautions in the FTS labeling include the following:

- the FTS patch "…should be applied to non-irritated and non-irradiated skin…"

- "Do not use soaps, oils, lotions, alcohol, or any other agents that might irritate the skin or alter its characteristics.

- "Allow the skin to dry completely prior to system application."

5

- "Do not put the Duragesic® or FTS patch on skin that is very oily, burned, broken out, cut, irritated, or damaged in any way."

- "...a new system should be applied to a different skin site after removal of the previous transdermal system."

FTS and Duragesic® are Bioequivalent

*Introduction and Definitions*

Studies to measure bioavailability (BA) and/or establish bioequivalence (BE) of a product are important elements in support of New Drug Applications (NDAs) and Abbreviated New Drug Applications (ANDAs). BA studies focus on determining the process by which a drug is released from a drug delivery system and moves to the site of action. BA data provide an estimate of the fraction of the drug absorbed, as well as its subsequent distribution and elimination. BA can be generally documented by a systemic exposure profile obtained by measuring drug and/or metabolite concentration in blood or plasma of a healthy volunteer or patient over time.

Bioavailability is typically defined as the rate and extent to which the active ingredient or active moiety is absorbed from a drug product and becomes available at the site of action. $C_{max}$, the maximum drug plasma concentration observed after the dose of a drug product is used as an indirect measure of rate of absorption or the Peak Exposure that a patient would experience. $AUC_{0-t}$, the area under the plasma concentration-time curve to the last measurable plasma concentration and $AUC_{0-\infty}$ (AUC extrapolated to an infinite time) are the best measures of the extent of absorption or the Total Exposure to a drug by a patient. Reliance on measures of systemic exposure is necessary to establish that there is a comparable rate and extent of absorption between two products. When this is established, the FDA accepts that the two products are bioequivalent and that BE complies with the statutory and regulatory objective of ensuring comparable therapeutic effects and the interchangeability of two products that are pharmaceutical equivalents, for example, the FTS and Duragesic®.

In Summary, Peak Exposure is quantified by measuring the peak drug concentration ($C_{max}$) obtained directly from the data without any calculations. While $C_{max}$ is a variable parameter, the statistics support the interchangeability of the two products: the mean $C_{max}$ for FTS was 0.626 ng/mL with a coefficient of variation of 36.49% and 0.601 ng/mL with a CV of 34.85% for Duragesic®. Since CV is a measure of variability, the similar %CV values obtained for the two products illustrate the similarity between FTS and Duragesic®. Clearly the two products produced comparable $C_{max}$ values in this pivotal BE study, and the Peak Exposure to fentanyl was not statistically different between FTS and Duragesic®.

Exposure is quantified by calculating $AUC_{0-t}$ from the plasma profile using the trapezoidal rule while $AUC_{0-\infty}$ is the sum of $AUC_{0-t}$ plus $C_t/k_e$, where $C_t$ is the last measurable

6

drug concentration and $k_e$ is the terminal or elimination rate constant calculated from the terminal phase of the plasma profile. Bioequivalence is statistically established when the confidence interval calculated by the two one-side tests procedure for the test/reference ratio of Ln $C_{max}$ and Ln AUC falls within the interval of 80-125%. That was indeed the case in a Mylan sponsored BA/BE study conducted in 34 healthy young volunteers who were dosed in a crossover fashion with both products. The results of the study are illustrated by Figure 1 below which illustrates the similarity in the mean plasma profiles including $C_{max}$, the maximum fentanyl plasma concentration, for the two products in the 34 volunteers.



Figure 1. Mean fentanyl plasma concentration-time profiles for the two products compared in a BE study

The FDA's Office of Generic Drugs concluded that Duragesic® and FTS are bioequivalent and, therefore, are therapeutically equivalent. This supports the fact that these two products are interchangeable and that the $C_{max}$ and AUC values for the two products are comparable and not statistically different.

<u>FTS and Duragesic® Employ Different Formulations</u>

For two dosage forms to be bioequivalent to each other, the Code of Federal Regulations states that the two products must be "pharmaceutical equivalents." This means that the same drug must be found in both dosage forms and both products must be administered via the same route of administration. This does not mean that both products must use the same formulation. To the contrary, most generic products avoid using the same formulation as the innovator or

7

8

Reference Listed Drug (RLD) in order to avoid violating patent claims from the RLD.  FTS is pharmaceutically equivalent to Duragesic® but relies on a totally different formulation.

*Duragesic® Formulation*

The key difference between FTS and Duragesic® is that the majority of fentanyl contained in Duragesic® is incorporated into a reservoir gel.  The presence of the reservoir gel is necessary for Duragesic® to deliver its labeled dose.  A pouch containing the gel is made up of an occlusive backing onto which the release membrane is heat-sealed.  A silicone adhesive coated onto the surface of the release membrane also contains fentanyl.  This adhesive adheres Duragesic® to the patient. A schematic diagram of the Duragesic® patch copied from Page 54 of the SBA is reproduced as Figure 2 below.



Figure 2.  Schematic of Duragesic® taken from 1990 SBA

There is no reservoir gel in FTS and no release membrane.  The Duragesic® formulation also differs from FTS in that ethanol (Alcohol USP) is a key component of the reservoir gel.  The reservoir gel contains 23% ethanol.  As per the labeling of Duragesic®, 0.1 mL of alcohol USP per 10 cm$^2$ is found in the patch.  On Page 249 of the Duragesic® Summary Basis of Approval (SBA), the reviewer wrote the following: "The TTS system reservoir contains a gelled aqueous solution of ethanol which acts to solubilize the fentanyl in the reservoir and alter the permeability of the stratum corneum..."  The reviewer also stated, "... Since the permeability of the skin doubles...as a function of ethanol flux, it is probable that the fall-off in ethanol in the system over time is related to the decline in the fentanyl flux observed after 24 hours of TTS system application."  There is no alcohol in FTS.

8

9

*FTS Formulation*

FTS uses the simplest formulation for self-adhering transdermal delivery systems or patches. The drug is combined with the adhesive during the manufacturing, and there is no liquid phase in the patch. In FTS, there are only three layers: (1) a backing layer onto which the adhesive is coated, (2) the adhesive layer that contains the drug, and (3) a release liner that protects the adhesive-drug layer. The release liner is removed from the adhesive surface of the patch prior to its application to a patient's skin. Figure 3 is an illustration of FTS, including the final packaging that a patient receives. There is no ethanol or any other enhancer to facilitate fentanyl penetration through the skin. The FTS formulation is an optimal combination of a silicone polymer with adhesive properties and sufficient fentanyl solubility such that the drug can dissolve in the adhesive and diffuse to the skin surface resulting in a continuous drug delivery rate for the full 72-hour dosing period. The final formulation contains fentanyl as a molecular dispersion on the adhesive (a true solution) as well as fentanyl suspended throughout the adhesive as undissolved drug.



Figure 3. Illustration of a 100mcg FTS including a box containing several patches, the primary package (foil pouch), and a view of the patch from the side of the backing layer showing the drug name and dose delivery rate. The exploded view is a schematic depicting the three layers of the patch. The upper layer is the backing layer and the middle layer is the adhesive-drug layer that would be in contact with a patient's skin. The

9

lower layer is the release liner that protects the adhesive surface until it is removed prior to application.

The amount of drug dissolved in the polymer adhesive is determined by the solubility of fentanyl in that polymer and cannot exceed that limit set by the solubility properties. Further, when the dissolved drug is absorbed from the polymer adhesive in contact with the skin, the undissolved drug in suspension can then dissolve and take the place of the absorbed drug. There is no liquid or gel reservoir in this patch. Rather, the fentanyl drug supply is in the adhesive-drug layer. When the fentanyl in solution with the adhesive polymer is absorbed from the surface, other molecules in solution will diffuse to the surface; they in turn will be replaced by the suspended fentanyl that can go into solution on the adhesive thus replacing the absorbed drug and prolonging the drug delivery. The limited solubility of fentanyl in the silicone adhesive serves to control the delivery of drug to the stratum corneum, the upper layer of the epidermis. Since the entire fentanyl contents of the patch are not in solution in the adhesive, there is a limit as to what can be released to the patient when the patch is first applied. The balance of the fentanyl (75% or more) is found as undissolved drug in suspension thus avoiding the possibility of rapid dosing of the drug contents when applied to normal (not abraded) skin.

### Conclusion

It is clear that FTS and Duragesic® are bioequivalent. It is also clear that the two (2) products employ very different formulations. As set forth more fully below, the differences between FTS and Duragesic® formulations play a key role in the overall safety of each product.

### FTS Cannot "Dose Dump"

#### Definition and Problems with Form-Fill-Seal Transdermal Systems

The term "dose dumping" has been used for decades as a description of failure of an extended-release (ER) formulation. If an oral ER product releases its entire drug content within a few minutes, this is referred to as "dose dumping." A patient could be at a higher risk of toxicity, since an ER formulation usually contains more quantity of drug per dosage unit than an immediate-release product. This is true for transdermal products as well as oral dosage forms. Obviously, when the ER product contains a drug with a narrow therapeutic window, dose dumping becomes a very serious concern. For a form-fill-seal product such as Duragesic®, leaking of the contents of the liquid or gel reservoir is an example of dose dumping. The reason for the recalled lots of Duragesic® was that the patches were leaking because of poor heat sealing. The contents of the reservoir could therefore leak onto the skin of a patient thus increasing the dosing area that is equivalent to administering a larger dose. It has been demonstrated with a wide variety of transdermal products that dose is proportional to the surface area of the patch. The publication from my pharmacokinetics group at Key Pharmaceuticals is a

10

rigorous test of this concept in which it was demonstrated that both the parent drug and metabolite levels were directly proportional to the surface are of the nitroglycerin patch. (R.C. Jewell, C. Banfield, P.K. Noonan, D. Ruggirello, Y. Huang, and M.A. González: Dose-Proportionality of Transdermal Nitroglycerin, Pharm. Research (1992), Vol. 9, No. 10, 1284-1289).

When the Duragesic® patch leaks due to a failure in the release membrane (SBA terminology) or "rate-controlling membrane," (marketing terminology) not only does the dosing surface area increase, but the skin is directly exposed to the alcohol in the reservoir which enhances the absorption of the fentanyl. Permeation of fentanyl through the stratum corneum (outer layer of the skin) is the slowest step in drug absorption, and this is referred to as the rate limiting step. It is this step that controls drug absorption. If you alter the stratum corneum by exposing it to a penetration enhancer, the barrier properties of the skin are greatly diminished. When the Duragesic® patch leaks, the dosing area is increased and the skin is altered by a penetration enhancer. The end result is a rapid absorption or "dose dumping" of fentanyl. The main role of the "rate-controlling membrane" in Duragesic is to seal the liquid reservoir into a pouch and to fix the surface area through which the drug is exposed to the skin of the patient. When this membrane fails, the liquid reservoir leaks onto the skin of the patient and increases the possibility of a fentanyl over dose.

*Why FTS cannot dose dump*

In FTS, fentanyl is distributed throughout the adhesive. Some of the drug is dissolved in the adhesive, but the majority is suspended rather than dissolved. In other words, the suspended drug is actually present as particles or crystals of undissolved fentanyl. Both the dissolved fentanyl (molecular dispersion of drug in the adhesive; no liquid is involved) and the suspended fentanyl are dispersed in the adhesive. Fentanyl can leave the patch only by molecular diffusion through the adhesive to the stratum corneum of the epidermis. Dissolution of suspended fentanyl behind the releasing surface of the patch replaces drug that is absorbed from the patch into the skin. Suspended drug then becomes dissolved drug, keeping the dissolved fentanyl concentration in the patch fairly constant during the dosing interval. Dose dumping does not occur because release is controlled by the diffusion of molecules within the patch's adhesive matrix along with diffusion across the outer layer of skin. This mechanism of controlling the drug penetration through the skin is better than a so-called "rate-controlling membrane." The only evidence that the release membrane serves to delay drug release is when Duragesic® is compared to FTS in an *in vitro* dissolution test. In this type of test, the patch is placed in a glass vat containing 600-900 ml of an aqueous media; the official dissolution methodology is described in the United States Pharmacopeia. In a dissolution test, samples of the dissolution media are collected periodically and measured for drug content. In this type of test, Duragesic will release fentanyl at a slower rate than FTS, because the drug is releasing directly from the patch into the aqueous media; there is no stratum corneum to slow down the drug release.

The Franz Cell is an apparatus for *in vitro* testing of transdermal products in which the patch to be tested is put onto human cadaver epidermis. It is an *in vitro* method in that no live

11

animal or human is used in the testing, and the drug can be measured in an aqueous media similar to that used in the *in vitro* dissolution method described above. This type of study is also called a flux study and the results are flux data. When using the Franz Cell or a similar device, the drug must first diffuse through the stratum corneum of the cadaver epidermis, before it reaches the aqueous media where the drug can be measured. When Duragesic® and FTS patches are compared in a Franz diffusion cell, the drug release from the two products (the flux data) is comparable. The reason that the flux data are comparable is that the stratum corneum acts as a barrier to diffusion thus proving that the release membrane is not necessary to control transdermal fentanyl dosing. If the flux data for the two products were not comparable, it would not be possible to demonstrate bioequivalence between the two products when tested *in vivo*.

Further, the physico-chemical properties of the adhesive polymers and of fentanyl determine the solubility of the drug in the adhesive. Since all solvents are removed during the manufacturing process, the solubility of fentanyl in the adhesive determines how much drug can be dissolved in the adhesive. It is impossible to have more drug in the adhesive than that allowed by the physico-chemical properties of the drug and the polymer adhesive.

*Conclusion*

FTS cannot dose dump because the drug release is controlled by the adhesive-drug matrix as discussed above.

FTS Cannot Leak

There is no liquid in the FTS formulation. Even from a layman's perspective, leaking implies the presence of a liquid or gas neither of which is present in FTS. As such, it is scientifically impossible for FTS to leak.

FTS is Superior to Alternative Fentanyl Transdermal Designs, Including Duragesic®

As noted previously, leakage problems are associated with Duragesic®. Such problems are also associated with other newly introduced fentanyl transdermal delivery systems employing a similar design. Leaking problems are not present with FTS. There is no need for a rate-controlling membrane in FTS because the diffusion of drug from the patch into the skin of the patient is controlled by molecular diffusion through the adhesive to the stratum corneum of the patient's epidermis. The drug reservoir (drug dissolved in the polymer adhesive) is maintained by the undissolved drug in suspension which can dissolve and replace the drug in solution when it is absorbed through the skin of the patient. There is no need for any additional membrane in the FTS formulation.

An alternate matrix fentanyl product was developed by a Greek Company, Lavipharm. This product was a solid state matrix system with a rate-controlling membrane. In other words it combined a matrix system similar to the Mylan FTS (drug in adhesive) with a rate-controlling membrane similar to that in Duragesic®. The product known as Fentadur® was approved by the FDA as an ANDA in 2006. Apparently Fentadur® could not be manufactured for commercial

12

use and was never marketed. Obviously, the combination of fentanyl in adhesive with a release membrane was too complicated to manufacture reproducibly or under the FDA's Good Manufacturing Practices requirements.

High potential for abuse and diversion is another problem associated with gel reservoir fentanyl transdermal products on the market. Particularly, fentanyl can be extracted from these reservoir patches via syringes, squeezing, chewing and/or cutting. The same potential for abuse and diversion is not present with FTS.

Even competitors employing a liquid reservoir design view the FTS design as superior. For example, deposition testimony of Robert Gale in an unrelated case revealed that Johnson and Johnson (J&J) questioned Alza's decision to remain wed to a reservoir, rate control design, and even thought of this technology as an "old concept." (Gale Deposition P. 93)  Obviously, J&J felt that there was a difference between a liquid reservoir formulation and an adhesive matrix patch. In fact, J&J has recently launched a new Duragesic® formulation comprised of an adhesive matrix with no rate-control membrane. Thus Alza and J&J endorse the concept that an adhesive matrix design is superior to that of one with a liquid/gel reservoir. It should be noted, however, that the new matrix patch from J&J uses a different polymer adhesive with a higher solubility for fentanyl, thus the entire drug is found in solution. Since there is no drug in suspension, a higher amount of fentanyl is found in the patch to maintain the proper flux and a larger amount remains in the patch after patient use. In this new Duragesic®, as with FTS, there is no need for a rate-controlling membrane, and the FDA readily approved this product.

<u>No Evidence of Design Defect</u>

There is no evidence to suggest that any FTS patch Sandra Richardson wore was defective. It is, therefore, my opinion that the FTS patch Sandra Richardson was allegedly wearing on the day of her death worked as it was intended to work and delivered fentanyl as designed.

Even assuming for the sake of argument that more fentanyl than intended somehow was introduced into FTS during the manufacturing process, the rate of delivery would not increase. This is because the majority of the fentanyl contained in FTS is suspended in the adhesive. Equilibrium between the solid form of fentanyl and fentanyl in solution is required for such suspension. Thermodynamic activity of the crystalline form of fentanyl sets the equilibrium. An increase in the solid form of fentanyl would not in any way change the fentanyl in solution. It is this fentanyl in solution that sets the diffusion of drug from the patch through the stratum corneum. Consequently, the driving force for partitioning and diffusion into the skin would not change. There could be no increase in the delivery rate of fentanyl due to the fact that the stratum corneum of the skin serves as the rate-controlling element in the route of delivery.  The only effect a greater amount of suspended fentanyl in FTS would have is to lengthen the period of time a patch could be worn.  It does not increase the rate of delivery.

13

Dated: 3/1/2010

By:

Mario A. Gonzalez, Ph.D.

14

## Testimony History for Mario A. González, Ph.D.

J&J v. Mylan: Prepared Expert Witness Report, was deposed by J&J counsel, and testified in court; 2003

Biovail Pharmaceuticals Canada vs Apotex inc.: Prepared Affidavit (Expert Witness Report) and was deposed by Apotex counsel; 2006

Biovail Pharmaceuticals Canada vs Sandoz. Prepared Affidavit (Expert Witness Report) and was deposed by Sandoz counsel; 2006

Schering-Plough K-Dur Antitrust Litigation: Prepared Expert Witness Report and was deposed by counsel for the plaintiffs, 2008

Janssen-Ortho & Alza v. Novopharm : Prepared Affidavit (Expert Witness Report) and was deposed by Novopharm counsel; 2009

Janssen-Ortho & Alza v. Apotex : Prepared Affidavit (Expert Witness Report) and was deposed by Apotex counsel; 2009

EXHIBIT 2

# THE WEINBERG GROUP

March 1, 2010

Jennifer L. Cairns, Esq.
McGuireWoods, LLP
625 Liberty Avenue
Pittsburgh, PA 15222

**RE: Richardson et al. V. Mylan Laboratories, Inc., et al.**

Dear Ms. Cairns:

You and your firm have retained me and The Weinberg Group Inc. as an expert and
consultant in the Food and Drug Administration approval process, for the above referenced
case. You requested that I review pertinent documents and the regulatory record of Mylan's
abbreviated new drug application ("ANDA") for fentanyl transdermal system ("FTS") and
to provide conclusions and opinions about the appropriateness of the Mylan approval.

## I.     MY EXPERIENCE

**Education**

I received a B.S. in Pharmacy from the Massachusetts College of Pharmacy, Boston,
Massachusetts, in 1972. I obtained my M.S. in Hospital Pharmacy Administration from
Arnold and Marie Schwartz College of Pharmacy of Long Island University, Brooklyn, New
York, in 1978. I obtained my Ph.D. in Pharmacology from Uniformed Services University
of the Health Sciences, Bethesda, Maryland, in 1991.

**Current Position**

I currently hold the position of Vice President of Clinical Pharmacology & Biopharmaceutics
at The Weinberg Group Inc., an organization that provides scientific and regulatory
consulting services to the pharmaceutical industry. I joined The Weinberg Group in 1997 as
the Director of Biopharmaceutics in the Worldwide Health Care Products Group.

**Previous Positions**

Prior to joining The Weinberg Group, I held several positions at the United States Food and
Drug Administration (FDA), the most recent being Director of the Division of
Bioequivalence, Office of Generic Drugs, Center for Drug Evaluation and Research
(CDER)(1997). In this capacity, I was responsible for the review of Abbreviated New Drug
Applications (ANDAs) to assure that generic drugs are bioequivalent to the brand name

The Weinberg Group Inc. | 1220 Nineteenth St, NW, Suite 300 | Washington, DC 20036 | USA
P +1 202.833.8077 | F +1 202.833.7057 | weinberggroup.com

18

Jennifer L. Cairns, Esq.
March 1, 2010
Page 2

products. I directed approximately 24 doctoral level scientists in the review of the bioequivalence section of generic drug applications. I also established sound scientific principles and promoted their application in a consistent and fair manner, and developed and contributed to drug specific and general guidelines for the pharmaceutical industry including: (1) SUPAC-SS: Non-Sterile Semisolid Dosage Forms; Scale-up and Post-Approval Changes: Chemistry, Manufacturing, and Controls; In Vitro Release Testing and In Vivo Bioequivalence Documentation; (2) SUPAC-IR: Immediate-Release Solid Oral Dosage Forms; Scale-Up and Post-Approval Changes: Chemistry, Manufacturing and Controls, In Vitro Dissolution Testing, and In Vivo Bioequivalence Documentation; (3) SUPAC-MR: Modified Release Solid Oral Dosage Forms Scale-Up and Post-Approval Changes: Chemistry, Manufacturing, and Controls; In Vitro Dissolution Testing and In Vivo Bioequivalence Documentation; (4) Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations; and (5) Dissolution Testing of Immediate Release Solid Oral Dosage Forms. In addition, I was an active contributor do the SUPAC-TDS (transdermal systems) which as of this time still has not been finalized by the FDA.

At CDER, I was also Director of the Division of Pharmaceutical Evaluation III, Office of Clinical Pharmacology and Biopharmaceutics (1994-1997), Chief of the Pharmacokinetics Evaluation Branch I, Division of Biopharmaceutics (1992-1993), Deputy Director in the Office of Generic Drugs (1990-1991), and Acting Section Head in the Anti-Infective Group, Division of Biopharmaceutics (1989). In the Division of Biopharmaceutics, I also served as Acting Branch Chief for the Scientific Support Branch (1988), Acting Section Head for the Rapid Resolution Team (1988), pharmacokinetic reviewer (1987), and Special Assistant to the Acting Director (1982-1983). I served for two years as a biopharmaceutical analyst at the National Center for Drugs and Biologics (1980-1981).

Prior to joining the FDA, I was Deputy Chief, Assistant Chief, and Director of Quality Control in the Pharmacy Department of the United States Public Health Service Hospital, Staten Island, New York.

In addition to my consulting services for The Weinberg Group, I had maintained my clinical practice of pharmacy on a part-time basis and have practiced pharmacy in hospital, home health care, independent and chain drug store settings. I am currently registered to practice pharmacy in Maryland and Massachusetts and my registration in New Jersey is inactive at this time.

I am a contributor to and serve on the editorial board of the Journal of Generic Medicines. I am a member of several professional organizations, including the American Society for Clinical Pharmacology and Therapeutics (ASCPT) and the American Association of Pharmaceutical Scientists (AAPS). I have also received honors and awards for my service in the public health arena, including the Center for Drug Evaluation and Research Special Recognition Award and the Meritorious Service Medal of the U.S. Public Health Service.

My current curriculum vitae are Attachment A.



Jennifer L. Cairns, Esq.
March 1, 2010
Page 3

## II.     MATERIALS RELIED UPON

1. Certificate of Analysis and Drug Release Profiles of Mylan's FTS lot 6S0031
2. Certificate of Analysis and Drug Release Profiles of Mylan's FTS R6J0001
3. Andrea Miller Deposition Transcript
4. Mylan's Perspectives on a Risk Management Plan for Transdermal Fentanyl Products
5. Mylan's original ANDA submission
6. Mylan's FTS Formulation Development Report
7. Mylan and FDA communications
8. Mylan's Periodic Safety Updates
9. Mylan's Annual Reports
10. Citizen Petitions regarding FTS
11. Robert Potter Deposition Transcript
12. William Brochu Deposition Transcript
13. Michael Houghton Deposition Transcript

## III.     ABBREVIATED NEW DRUG APPLICATION PROCESS

An abbreviated new drug application (ANDA) is used where a manufacturer desires to market a generic version of a previously approved (pioneer) product relying on the underlying safety and efficacy of the approved product. An ANDA product must be the same as a "listed drug," i.e., it must be identical in active ingredient(s), dosage form, strength, route of administration, and conditions of use. Conditions of use that are protected by exclusivity or patent may be omitted. (21 CFR § 314.92(a)(1)).

ANDAs include the formulation, labeling, chemistry, manufacturing, and controls information necessary to establish that the generic product is identical to the pioneer product, and can be properly manufactured and controlled to desired specifications and most importantly, bioequivalence information concerning the drug product. The demonstration of bioequivalence assures that the ANDA product will have the same safety and efficacy as the pioneer product. In addition, the ANDA must include evidence that the labeling proposed for the new drug is the same as the labeling approved for the pioneer drug.

Demonstration of bioequivalence is a critical element for an ANDA product. The FDA requires that ANDA applicants conduct bioequivalence testing using the most accurate, sensitive and reproducible methodology from the approaches described in 21 CFR § 320.24. The first approach listed is an in vivo test in humans in which the concentration of the active ingredient is measured in plasma as a function of time (21 CFR § 320.24(b)(1)(i)). The fifth and last approach is a well-controlled comparative clinical trial that demonstrates equivalent safety and effectiveness between the ANDA product and the listed drug. This approach is the least accurate, least sensitive and least reproducible of the general approaches for demonstrating bioequivalence.



Jennifer L. Cairns, Esq.
March 1, 2010
Page 4

The labeling (including the container label, package insert, and Medication Guide, if applicable) must be the same as the labeling approved for the reference listed drug. The only allowed differences between the labeling of an ANDA product and the labeling of the reference listed drug are differences in site of manufacture or distributor, differences in expiration date, formulation, bioavailability, or pharmacokinetics. In addition, the ANDA product's labeling may differ in order to comply with FDA labeling guidelines or other guidance, or other aspect of labeling protected by patent or exclusivity. (21 CFR § 314.94(a)(8)(iv)).

Once the FDA has determined a product is the generic of another, the generic product may be substituted for the pioneer product and receives what is known as an "AB rating" in the FDA's list of approved products, known as the "Orange Book." If a generic product is not bioequivalent to the pioneer product, it will not be approved and the FDA will not accept the application. The generic product must also include labeling identical to the pioneer product.

## IV.    MYLAN'S FENTANYL TRANSDERMAL SYSTEM ANDA

In this matter, the Mylan FTS is an approved generic form of Duragesic®, a transdermal system providing continuous systemic delivery of fentanyl, having an approved new drug application (NDA) by Alza Corp. As a generic manufacturer, Mylan is required by law to conform to the warnings and instructions provided by Duragesic. Mylan is prohibited from placing a warning on its drug different from or in addition to the label of the branded product. The FDA will not permit Mylan to market its generic FTS with a label that deviates from the label previously approved for Duragesic. Furthermore, Mylan is not permitted to unilaterally change the warning on its label and market its product with a new label containing any additional or different information.

The FDA's regulations for the content and format of an abbreviated application (21 CFR 314.94(a)(8)(iii)) require the following in the ANDA submission:

> "A statement that the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a)(8)(iv) of this section."

The differences in paragraph (a)(8)(iv) relate to the production or distribution by different manufacturer as well as different expiration date and formulation.

Section 21 CFR 314.97 states that abbreviated new drug applicants shall comply with the requirements of 21 CFR 314.70 for submitting supplements and other changes to an approved application. One of the changes described in this regulation (314.70(c)(6)(iii)(A), (B) and (C)) regards a change in labeling that can be implemented at the same time that the FDA is informed of the change. In my opinion, the labeling changes described in 314.70 do



Jennifer L. Cairns, Esq.
March 1, 2010
Page 5

not apply to abbreviated new drug applicants because it would contradict 21 CFR 314.92 which states that an abbreviated application is for a drug product that is the same as a listed drug. The regulation defines "same as" to mean identical in active ingredient(s), dosage form, strength, route of administration, and conditions of use, except that conditions of use for which approval cannot be granted because of exclusivity or an existing patent may be omitted. Conditions of use would include the labeling changes described in 314.70(c)(6)(iii)(A), (B) and (C). As the conditions of use must be the same as the listed drug, an abbreviated new drug applicant can't change the labeling of its product and the labeling requirements of 314.70 are not applicable to an ANDA.

Based on my expertise, Mylan could not have marketed this product under the federal regulatory scheme with a label that deviated from the Duragesic label. Mylan submitted its ANDA to the FDA with the assurance that the labeling and warnings which would accompany the product were the same as that approved for transdermal fentanyl in Alza's NDA. The FDA would not permit a deviation in the label or warnings that deviated from Duragesic because health care practitioners have the expectation that a generic product performs the same in all aspects as the innovator product.

### Mylan's Proposed Changes to Labeling

On December 16, 2005, Mylan submitted General Correspondence to its FTS ANDA proposing changes in the pouch labeling of the product that could be implemented quickly. Mylan's intent was to readily address and alleviate the potential cause of various adverse events observed in patients who improperly use transdermal fentanyl products. On April 7, 2006, Mylan received a response from the Office of Generic Drugs regarding the labeling proposal indicating that Mylan could not implement the change until such changes were made to the Reference Listed Drug (Duragesic).

On December 21, 2007, the FDA updated the July 2005 public health advisory. In the Information for Healthcare Professionals: Fentanyl Transdermal System (marketed as Duragesic and generics), the FDA referred to a new Medication Guide for patients. However, the Medication Guide was not approved by the FDA until February 7, 2008 as noted in the FDA's letter to Johnson & Johnson Pharmaceutical Research & Development, L.L.C. regarding its Duragesic NDA 19-813/S-033. Furthermore, the letter stated that the Risk Management Plan (RMP) that was submitted as part of the Duragesic NDA Supplement S-043 was still under review as of the date of the letter. It is my understanding that at the present time, the Risk Management Plan has not been approved by the FDA for Duragesic which prevents Mylan or any other generic FTS from implementing a RMP.

### Promotional Materials

Product advertisements and promotional materials require pre-approval by the FDA. Proposed advertising and/or promotional campaigns must be submitted to the FDA's Division of Drug Marketing, Advertising, and Communications (DDMAC). DDMAC carefully reviews promotional materials to assure that the content is in compliance with the



Jennifer L. Cairns, Esq.
March 1, 2010
Page 6

approved labeling of the product. Therefore, Mylan's promotional material for its FTS product had to be in compliance with the approved label or DDMAC would not have approved the promotional campaign.

## V.   OPINIONS

1.  In my opinion, with a reasonable degree of regulatory-scientific certainty, Mylan submitted an appropriate ANDA for its FTS and followed all the required FDA regulations and guidances in seeking approval of its product. The FDA performed an extensive review of all of Mylan's data supporting its product, including the label and warnings, and found it to be acceptable and therefore, approved the Mylan product as therapeutically interchangeable to Duragesic. In my opinion, the Mylan FTS is a safe and effective product as demonstrated by the FDA's approval of Mylan's ANDA submission.

2.  In my opinion, with a reasonable degree of regulatory-scientific certainty, Mylan is prohibited from changing the labeling of its FTS product until the FDA approves such changes for the reference listed drug (Duragesic). Mylan attempted to change the labeling for its FTS product to more effectively communicate information regarding the safe and proper use of the product. However, Mylan was prohibited from implementing the changes to the labeling of its product due to FDA regulations requiring the labeling of the generic to be identical to the labeling of the Reference Listed Drug (Duragesic).

3.  In my opinion, with a reasonable degree of regulatory-scientific certainty, Mylan complied with the FDA's, specifically DDMAC's, approval process for the advertising and promotional campaign of its FTS product. Promotional material requires pre-approval from the FDA's DDMAC and the content of the promotional material must comply with the approved labeling of the product. Advertising or promotional material that made claims not supported by the approved labeling would render the product to be misbranded in violation of the Federal Food, Drug and Cosmetic Act and accordingly would not have been approved by the FDA and DDMAC.

Very truly yours,

Nicholas M. Fleischer, R.Ph., Ph.D.
Vice President - Clinical Pharmacology & Biopharmaceutics
The Weinberg Group Inc.

NMF/kw

Enclosure



**ATTACHMENT A**

**CURRICULUM VITAE**
**NICHOLAS M. FLEISCHER, R.PH., PH.D.**



**THE WEINBERG GROUP**
Science minds over business matters.

Nicholas M. Fleischer, R.Ph., Ph.D.
Vice President
P +1 202.730.4131
nick.fleischer@weinberggroup.com

## EDUCATION

1991    Ph.D., Pharmacology, Uniformed Services University of the Health Sciences, Bethesda, Maryland

1978    M.S., Hospital Pharmacy Administration, Arnold and Marie Schwartz College of Pharmacy of Long Island University, Brooklyn, New York

1972    B.S., Pharmacy, Massachusetts College of Pharmacy, Boston, Massachusetts

## EXPERIENCE

Dr. Nicholas Fleischer is a Vice President at The Weinberg Group. He has extensive experience in biopharmaceutics, pharmacokinetics, and clinical pharmacy. Prior to joining The Weinberg Group, Dr. Fleischer held several positions at the United States Food and Drug Administration (FDA), the most recent being Director of the Division of Bioequivalence, Office of Generic Drugs, Center for Drug Evaluation and Research (CDER). At CDER, he was also Director of the Division of Pharmaceutical Evaluation III, Office of Clinical Pharmacology and Biopharmaceutics, Chief of the Pharmacokinetics Evaluation Branch I, Division of Biopharmaceutics, Deputy Director in the Office of Generic Drugs, and Acting Section Head in the Anti-Infective Group, Division of Biopharmaceutics. In the Division of Biopharmaceutics, he also served as Acting Branch Chief for the Scientific Support Branch, Acting Section Head for the Rapid Resolution Team, pharmacokinetic reviewer, and Special Assistant to the Acting Director. He served for 2 years as a biopharmaceutical analyst at the National Center for Drugs and Biologics.

Prior to joining the FDA, Dr. Fleischer was Deputy Chief, Assistant Chief, and Director of Quality Control in the Pharmacy Department of the United States Public Health Service Hospital, Staten Island, New York. He maintains his clinical practice of pharmacy on a part-time basis. Dr. Fleischer serves on the editorial board of the Journal of Generic Medicines.

His experience at The Weinberg Group includes:

**Strategic, Drug Development, and Regulatory Support**

- Provides evaluation and analysis of a product development plans for pharmaceuticals and biologics, providing strategic direction based on regulatory, scientific, and marketing issues

- Contributes to or directs due diligence evaluations for potential acquisitions, including consideration of scientific data and possible regulatory strategies



**THE WEINBERG GROUP**
Science minds over business matters.

Nicholas M. Fleischer, Ph.D.
Page 2

- Evaluates and provided advice to clients on adequacy of draft regulatory submissions; manages revisions of pharmacology, clinical, toxicology, and manufacturing sections as needed

- Provides scientific and strategic support to client in resolving product effectiveness and/or safety issues, including thorough review and critical analysis of the published literature pertaining to the drug class.

**Litigation support**

- Serves as an expert witness in generic drug and pharmaceutical patent infringement litigation.

Prior to joining The Weinberg Group, Dr. Fleischer's FDA experience included the following:

**FDA, CDER, Division of Bioequivalence, Office of Generic Drugs**, Director

Responsible for an international program to assure that generic drugs were bioequivalent to the brand name products. Directed approximately 24 doctoral level scientists in the review of the bioequivalence section of generic drug applications. Established sound scientific principles and promoted their application in a consistent and fair manner. Developed and contributed to drug-specific and general guidelines for the pharmaceutical industry including SUPAC-SS Nonsterile Semisolid Dosage Forms Scale-up and Postapproval Change: Chemistry, Manufacturing, and Controls; *In Vitro* Release Testing and *In Vivo* Bioequivalence Documentation.

**FDA, CDER, Division of Pharmaceutical Evaluation III, Office of Clinical Pharmacology and Biopharmaceutics**, Director

Responsible for supervising the review of the human pharmacokinetics and bioavailability section of New Drug Applications (NDAs) and pharmacokinetic/biopharmaceutic data in Investigational New Drug Applications (INDs). The first three anti-HIV protease inhibitor drugs were reviewed and approved under his directorship. Dr. Fleischer served as the first chairman of the Biopharmaceutics Coordinating Committee and chaired the Therapeutics Inequivalence Action Coordinating Committee. He contributed to the development of the following guidances:

- Guidance for Industry: Drug Metabolism/Drug Interaction Studies in the Drug Development Process: Studies *In Vitro* (I)
- Dissolution Testing of Immediate Release Solid Oral Dosage Forms
- Extended-Release Solid Oral Dosage Forms and Development, Evaluation, and Application of *In Vitro-In Vivo* Correlations.

**Significant Review Activities**

- Identified potential polymorphic metabolism of omeprazole, first proton-pump inhibitor
- Uncovered problems with Bolar's generic version of Dyazide, which led to major recall and legal action against Bolar and subsequent Congressional investigation of FDA's generic drug approval process



**THE WEINBERG GROUP**
Science minds over business matters·

Nicholas M. Fleischer, Ph.D.
Page 3

- Developed market-wide remedial plan to prevent moisture-related decrease in bioavailability of carbamazepine tablets.

## PROFESSIONAL AFFILIATIONS

American Association of Pharmaceutical Scientists (AAPS)

AAPS Workshop on Bioequivalence of Topical Dermatological Dosage Forms Planning Committee

AAPS Workshop on Chemistry and Pharmacy Considerations During the Drug Development and Review Process: Challenges and New Initiatives Planning Committee

American Society for Clinical Pharmacology and Therapeutics (ASCPT)

Commissioned Officers Association of the USPHS

Massachusetts College of Pharmacy Alumni Association

Rho Chi Pharmaceutical Honor Society

## HONORS AND AWARDS

Center for Drug Evaluation and Research Special Recognition Award, 5 June 1998 (2 awards)
Meritorious Service Medal, U.S. Public Health Service, 30 May 1991
Graduate Student Grant for Research, USUHS, November 1987 and November 1986
Emma L. Bockman Award, USUHS, 13 May 1987
Unit Commendation, U.S. Public Health Service, 29 September 1981
Achievement Medal, U.S. Public Health Service, 12 August 1981

## LANGUAGES

Fluent in Hungarian

## PUBLICATIONS

Roth RI, Fleischer NM. 2009. A follow-on biological drug is not a biogeneric: Lessons from Omnitrope and Valtropin. Journal of Generic Medicines. 6:237-245.

Roth RI, Fleischer NM. 2005. Scientific issues for biogenerics/biosimilars. Journal of Generic Medicines. 2(2):125-132.

Roth R, Fleischer N. 2002. Gene therapy; Applications to pharmacy practice. J Am Pharm Assoc. 42(5):692-698.



**THE WEINBERG GROUP**
Science minds over business matters.

Nicholas M. Fleischer, Ph.D.
Page 4

Fleischer N, Perry R.  2002.  Report on the U.S. draft guidance for food effect and bioavailability studies.  Regul Aff J.  13(8):649-651.

Falk JI, Fleischer N.  1998.  FDA modernization efforts.  Regul Aff J.  7:469-471.

Shah, VP, Flynn GL, Yacobi A, et al.  1998.  Bioequivalence of topical dermatological dosage forms - methods of evaluation of bioequivalence, AAPS/FDA Workshop on 'Bioequivalence of Topical Dermatological Dosage Forms – Methods of Evaluating Bioequivalence', September 4-6, 1996, Bethesda, MD.  Skin Pharmacol Appl Skin Physiol.  11(2):117-24.

Shah, V., Flynn, G., Yacobi, A., et al. 1998. AAPS/FDA workshop report; bioequivalence of topical dermatological dosage forms -- methods of evaluation of bioequivalence.  Pharm Res. 15(2):167-171.

Singh GJ, Fleischer N, Lesko L, Williams R.  1998.  Evaluation of the proposed FDA pilot dose-response methodology for topical corticosteroid bioequivalence testing.  Pharm Res.  15(1):4-7.

Malinowski H., Marroum P, Uppoor UR, et al.  1997.  Draft Guidance for Industry, Extended-Release Solid Oral Dosage Forms and Development, Evaluation, and Application of *In Vitro-In Vivo* Correlations.  Adv Exp Med Biol.  423:269-288.

Zelonis A, Fleischer N, Walling R.  1979.  A pharmacy quality assurance program.  Hosp Formul.  14(2):205-211.

Fleischer N.  1973.  Promethazine hydrochloride-morphine sulfate incompatibility.  Am J Hosp Pharm.  30(8):665.


## ABSTRACTS

Holford, N., Fleischer, N. and Peck, C.  2005.  Topical Corticosteroid Bioequivalence – An Evaluation of the FDA Guidance.  Poster at the 2005 PAGE (Population Approach Group Europe) Annual Meeting, 16-17 June, Pamplona, Spain.

Fleischer, N.  2001.  Clinical Pharmacology Perspectives of Recent FDA Bioequivalence Decisions.  Poster at the 2001 Annual Meeting of the American Society for Clinical Pharmacology and Therapeutics, 6-10 April, Orlando, FL. (Abstract published in Clin. Pharm. Ther. 69(2):P36).

Fleischer, N.  1998.  Bioequivalence - Past, Present and Future. European Journal of Pharmaceutical Sciences 6/Suppl.1:S98.

Conner, D., Roizen, M., Fleischer, N., Almirez, R., and Peck, C.  1989.  Transcutaneous Chemical Collection of Isoflurane in Surgical Patients.  Poster at the International Conference on Prediction of Percutaneous Penetration, 4-6 April, Manchester, United Kingdom, (Abstract published in Pharmacotherapy 9(3):777).



**THE WEINBERG GROUP**
Science minds over business matters.

Nicholas M. Fleischer, Ph.D.
Page 5

Fleischer, N. and Peck, C. 1988. Formulation of the Gaseous Anesthetic Isoflurane for Intravenous Injection. Poster at the NIH/ADAMHA-Industry Collaboration Forum, 25 October, Washington, DC, the FDA Science Poster Exposition, 27-28 April, Rockville, Maryland, and the Annual Meeting of the American Association of Pharmaceutical Scientists, Washington, DC, 2 November, 1986, (Abstract published in Pharmaceutical Research 3(5):91S, 1986).

Fleischer, N., Peck, C., et al. 1988. Reduced Cutaneous Blood Flow Affects Transdermal Chemical Migration. Poster at the FDA Science Poster Exposition, Rockville, Maryland, 27-28 April, and at the Annual Meeting of the American Society of Clinical Pharmacology and Therapeutics, 9-11 March, San Diego, California. (Abstract published in Clin. Pharm. Ther. 43(2):137, 1986).

Fleischer, N. and Peck, C. 1988. The Transdermal Collection of Intravenously Administered Isoflurane. Poster at the FDA Science Poster Exposition, 27-28 April, Rockville, Maryland, and the Graduate Research Colloquium of the Uniformed Services University of the Health Sciences, 13 May, 1987, Bethesda, Maryland. Also presented at the Department of Pharmacology Seminar, USUHS, 28 April, 1987, and the Graduate Student Symposium of the DC Section, Society for Experimental Biology and Medicine, 25 March, Bethesda, Maryland, (Abstract published in Proc. Soc. Exp. Biol. Med. 188(1):115, 1988).

Fleischer, N., Peck, C., et al. 1988. The Pharmacokinetics of Intravenously Administered Isoflurane in the Rat. Poster at the FDA Science Poster Exposition, 27-28 April, Rockville, Maryland, and The Annual Meeting of the American Association of Pharmaceutical Scientists, 2-6 November, 1986, Washington, DC, (Abstract published in Pharmaceutical Research 3(5):165S, 1986).

Peck, C., Conner, D., Fleischer, N., et al. 1987. Physiologically Based Pharmacokinetic Modeling of Noninvasive Transcutaneous Chemical Dosimetry. Presented by N. Fleischer, at the Hanford Life Sciences Symposium, 20-23 October, Richland, Washington, (Abstract published in Health Physics, 57(Suppl.):157, 1989).


**TEACHING**

Fleischer, N. 2009. The New Drug Approval Process: NDA Submission and Review. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: A Program on Understanding How the Drug Industry is Regulated, 5 November, Washington, DC.

Fleischer, N. 2008. The New Drug Approval Process: NDA Submission and Review. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: A Program on Understanding How the Drug Industry is Regulated, 20 November, Washington, DC.

Fleischer, N. 2008. The New Drug Approval Process: NDA Submission and Review. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: A Program on Understanding How the Drug Industry is Regulated, 21 February, Washington, DC.



**THE WEINBERG GROUP**
Science minds over business matters.

Nicholas M. Fleischer, Ph.D.
Page 6

Fleischer, N. 2007. The Practical and Legal Perspective of Bioequivalence. Continuing Medical Education Program at http://www.cmediscussions.com/7155/ Released 12 October.

Fleischer, N. 2006. The Abbreviated NDA (ANDA), 505(b)(2) Applications, and Patent Exclusivity Issues. Presented at the Food and Drug Law Institute's Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 6 November, Washington, DC.

Fleischer, N. 2005. The New Drug Approval Process: NDA Submission and Review. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 17 November, Washington, DC.

Fleischer, N. 2005. Bioequivalence of Generic Drugs – Does Therapeutic Equivalence Follow? Presented at the Clinical Pharmacology Academic Conference, National Naval Medical Center, 29 March, Bethesda, MD.

Fleischer, N. 2004. The Full NDA. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 4 November, Washington, DC.

Fleischer, N. 2003. The Full NDA. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 17 November, Washington, DC.

Fleischer, N. 2002. Post-Approval Submission Requirements. Presented at the Regulatory Affairs Professional Society NDA Workshop. 8 November, Philadelphia, PA.

Fleischer, N. 2002. The Full NDA. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 4 November, Washington, DC

Fleischer, N. 2001. The Full NDA. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 8 November, Washington, DC

Fleischer, N. 2000. The Full NDA. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How the FDA Regulates the Drug Industry, 14 September, Washington, DC

Fleischer, N. 2000. International Regulatory Systems: Operating in a Global Market - ICH, FDA Initiatives, Reality. Presented at the Food and Drug Law Institute's 2000 Summer Internship Program. 21 June, Washington, DC.

Fleischer, N. 1999. The Full NDA. Presented at the Food and Drug Law Institute Workshop on Introduction to Drug Law and Regulation: Understanding How FDA Regulates the Drug Industry, 4 November, Washington, DC.



**THE WEINBERG GROUP**
Science minds over business matters.®

Nicholas M. Fleischer, Ph.D.
Page 7

Fleischer, N. 1998. Marketing Exclusivity: Selected Current Issues Facing Generic and Innovator Drug Companies - Scientific Perspectives. Presented at the Food and Drug Law Institute's 42nd Annual Education Conference, 17 December, Washington, DC.

Fleischer, N. 1998. The Full NDA. Presented at the Food and Drug Law Institute Course on Introduction to Drug Law and Regulation, 5 November, Washington, DC.

Fleischer, N. 1998. (initial appointment, 1993). Adjunct Associate Professor, Department of Pharmacology, Division of Clinical Pharmacology, Uniformed Services University of the Health Sciences, Bethesda, Maryland.

Fleischer, N. 1997. The "New Drug" Approval Requirement. Presented at the Food and Drug Law Institute Course on Introduction to Drug Law and Regulation, 27 October, Washington, DC.

Fleischer, N. 1997. Career Options for Ph.Ds. Presented at York College, CUNY, 29 September, Queens, New York.

Fleischer, N. 1990. Decisions in the Approval Process for ANDA's. Presented at the Advanced New Drug Approval Training for Analysts, 27 September, Philadelphia, Pennsylvania.

Fleischer, N. 1990. Monitoring Generic Drugs: An FDA Update and Perspective. Presented at the 35th Annual Ohio Pharmaceutical Seminar, 18 April, Columbus, Ohio.

Fleischer, N. 1989. Biopharmaceutical Issues. Presented at the Continuing Education Seminar for Federal Pharmacists, 9 December, Bethesda, Maryland.

Fleischer, N. 1989. MK-Model: A Demonstration. Presented at Division of Biopharmaceutics Scientific Rounds, 3 February, Rockville, Maryland.

Fleischer, N. 1979. Invited lecturer on "Pharmacy Practice in the USPHS and Career Opportunities," Rutgers College of Pharmacy, December 1979 and November 1980, Piscataway, New Jersey.

Fleischer, N. 1979. Invited lecturer on "Pharmacists in the Federal Government," Rutgers College of Pharmacy, March 1979, Piscataway, New Jersey.

Fleischer, N. 1977. Invited lecturer on "Aseptic Technique in Intravenous Additive Manufacture and Incompatibilities," USPHS Hospital Medical Intensive Care Unit Course for Nurses, January 1979 and March 1977.

Fleischer, N. 1977 and 1973. Invited lecturer for Pharmacology, Physician Assistant Training Program, USPHS Hospital, Staten Island, New York.

Fleischer, N. 1974. Invited lecturer for Pharmaceutical Calculations, Physician Assistant Training Program, USPHS Hospital, Staten Island, New York.

**THE WEINBERG GROUP**
Science minds over business matters.

Nicholas M. Fleischer, Ph.D.
Page 8

## PRESENTATIONS

Falk, J. and Fleischer, N. 2009. ANDA vs. 505(b)(2) – When and Why. Presented as Webinar, 30 September.

Cooper, P., Fleischer, N., Roth, R. 2009. Global Lessons in Developing Biosimilars. Presented as Webinar, 27 May.

Fleischer, N. 2008. Generic Carve-Outs. Presented to the Pharmaceutical Care Management Association State Health Affairs Committee Meeting, 9 January, Alexandria, VA.

Fleischer, N. 2007. FDA's 505(b)(2) NDA Process – A Key Avenue to Approval for Drug Delivery Technologies. Presented at the 12th Annual Drug Delivery Technologies & Deal Making conference, 26 September, New Brunswick, NJ.

Fleischer, N. 2007. 505(b)(2): Risks and Rewards of Generic Innovation. Presented at the 8th Annual Generic Drugs Summit on Strategic Planning for Growth in the Competitive Generics Marketplace, 19 September, Washington, DC

Fleischer, N. 2006. Evaluating the Present Position on Generic Biologics. Panel Presentation at The New York Biotechnology Association Annual Meeting, 18 April, New York, NY.

Holford, N., Fleischer, N., and Peck, C. 2005. Topical Corticosteroid Bioequivalence – An Evaluation of the FDA Guidance. Poster Presented at the 14th Meeting of the Population Approach Group in Europe, 17 June, Pamplona, Spain.

Fleischer, N. 2004. Biopharmaceutics Overview and FDA Standards for Bioequivalence. Presented to the Project Management Group of Sandoz Pharmaceuticals, 16 January, Dayton, NJ.

Fleischer, N. 2003. Biopharmaceutics Overview and FDA Standards for Bioequivalence. Presented to the Formulations Development Group of Geneva Pharmaceuticals, 31 October, Dayton, NJ.

Fleischer, N. 2003. Drug Delivery Technology – An Avenue for Bioequivalence. Presented at the Marcus Evans Generic Drugs Forum conference, 29 July, Philadelphia, PA.

Fleischer, N. 2003. The Impact of New and Pending FDA Guidances on the Pharmaceutical Industry. Presented at the SFBC Fort Myers Scientific Symposium, 25 April, Fort Myers, FL.

Fleischer, N. 2001. Evaluating the Present Position on Generic Biologics. Presented at the Institute for International Research meeting on Preparing for Successful Submissions & Understanding the Legal Challenges to Expedite Market Entry, 4 December, McLean, VA.

Fleischer, N. 1999. For Which Drug Products is a Multiple-Dose Bioequivalence Study Necessary. Presented at the Institute for International Research meeting on Establishing Bioequivalence - Speeding Development and Meeting Regulatory Requirements, 18 June, Philadelphia, PA.

**THE WEINBERG GROUP**
Science minds over business matters.*

Nicholas M. Fleischer, Ph.D.
Page 9

Fleischer, N. 1999. International Regulatory Guidelines: Where We Have Been and Where We Are Going. Presented at the Institute for International Research meeting on Establishing Bioequivalence - Speeding Development and Meeting Regulatory Requirements, 17 June, Philadelphia, PA.

Fleischer, N. 1998. Generic Drugs and Intellectual Property Rights in the Global Pharmaceutical Market - FDA Perspectives. Presented at the Fourth European Congress of Pharmaceutical Sciences, 11 September, Milan, Italy.

Fleischer, N. 1998. What Will the Requirements for Individual Bioequivalence Studies Mean for Generic Registrations in Europe. Presented at the Institute for International Research conference on Achieving Successful Generic Product Registration under the New System in Europe, 14 July and 2 April, London, England.

Fleischer, N. 1998. Utilizing Bioequivalence Study Requirements to Speed-Up Development and FDA Approval. Presented at the Institute for International Research conference on Generics - Marketing, Compliance & Procurement Strategies to Maximize Your Competitive Edge, 26 February, Orlando, Florida.

Fleischer, N. 1997. Update on Streamlining Bioequivalence Review Process, Database for Bio-Reviews. Presented at the 1997 Mid-Year Meeting and Educational Conference of the National Association of Pharmaceutical Manufacturers, 23 June, Washington, DC.

Fleischer, N. 1997. Division of Bioequivalence Perspectives. Presented at the 1997 Generic Pharmaceutical Industry Association Annual Meeting, 10 March, Miami, Florida.

Fleischer, N. 1997. Initiatives for Division of Bioequivalence. Presented at the 1997 National Association of Pharmaceutical Manufacturers Annual Meeting, 31 January, Naples, Florida.

Shah, V.P., Flynn, G.L., Yacobi, A., Maibach, H.I., Bon, C., Fleischer, N.M., et al. 1996. Bioequivalence of topical dermatological dosage forms – methods of evaluation of bioequivalence. Presented at the AAPS/FDA Workshop on Bioequivalence of Topical Dermatological Dosage Forms. September 4-6, 1996, Bethesda, MD.

Fleischer, N. 1996. Regulatory Perspectives of Product Line Extensions. Presented at the AAPS Midwest Regional Meeting, 20 May, Chicago, Illinois.

Fleischer, N. 1994. Penetration Enhancers -- Current Status, Regulatory and Safety Aspects. Presented at the AAPS Ninth Annual Meeting and Exposition, 8 November, San Diego, California.

Fleischer, N. 1993. Biopharmaceutics Perspectives in Drug Development. Presented at the AAPS Workshop on Chemistry and Pharmacy Considerations During the Drug Development and Review Process: Challenges and New Initiatives, 23 September, Arlington, Virginia.

Fleischer, N. 1990. Generic Drugs: Changes Being Implemented. Presented at the 86th Annual Meeting of the National Association of Boards of Pharmacy, 20 May, Phoenix, Arizona.



THE WEINBERG GROUP
Science minds over business matters.

Nicholas M. Fleischer, Ph.D.
Page 10

Fleischer, N. 1990. Safety and Efficacy in the Generic Drug Industry. Presented at the Annual Conference of the National Council for Prescription Drug Programs, 15 February, Scottsdale, Arizona.

Fleischer, N. 1989. FDA Commentary on Drug Metabolism Section of NDA. Presented at the Drug Development Workshop of the Regulatory Affairs Professionals Society, 13 June, Bethesda, Maryland.

Fleischer, N. 1989. New Programs in the Division of Biopharmaceutics. Presented at the 28th Annual International Industrial Pharmacy Conference, 2 June, Austin, Texas.

Fleischer, N. 1989. Importance of Pharmacokinetics/Pharmacodynamics in the Drug Development Process. Presented at the PMA R&D/Medical Section Annual Meeting, 12 April, Laguna Niguel, California.

Fleischer, N. and Peck, C. 1988. Utilization of Physiologic Pharmacokinetic Modeling to Evaluate the Transdermal Efflux of Isoflurane. Presented at the Second Annual Symposium Frontiers of Pharmacokinetics and Pharmacodynamics, 12-14 October, Little Rock, Arkansas.

Fleischer, N. 1986. Disposition and Transdermal Collection of Isoflurane. Presented at the Graduate Research Colloquium, USUHS, 14 May, Bethesda, Maryland, and at the Department of Pharmacology Seminar, USUHS, 6 May, Bethesda, Maryland.

Zelonis, A., Fleischer, N., and Walling, R. 1978. A Pharmacy Quality Assurance Program. Presented by A. Zelonis, at the USPHS Professional Association Meeting, 28 March, Atlanta, Georgia.

Fleischer, N. and Zelonis, A. 1977. Pharmacist Involvement at an Oncology Clinic. Presented by A. Zelonis, at the USPHS Professional Association Meeting, 6 April, San Francisco, California.

Fleischer, N. 1975. Improved Utilization of Pharmacy Manpower, by N. Fleischer. Presented (by title only) at the USPHS Professional Association Meeting, 2-5 June, Las Vegas, Nevada.

Fleischer, N. 1974. Quality Control for Microbial Contamination in a Hospital Pharmacy. Presented at the USPHS Professional Association Meeting, 9 April, Washington, DC.

Fleischer, N. 1973. Invited speaker on "Pharmacy as a Profession," Egbert Junior High School, Staten Island, April, New York.

## LIST OF EXPERT TESTIMONY WORK

for

Nicholas M. Fleischer, R.Ph., Ph.D.

Vice President, Clinical Pharmacology & Biopharmaceutics

The Weinberg Group Inc.

| Year | Case | Case No. | Lawyer | Law Firm | |
|------|------|----------|--------|----------|---|
| 2000 | FTC vs. Aventis | FTC Case (Docket No. 9293) | Peter Bernstein | Shook Hardy | Expert report and deposition |
| 2000 | Blue Cross Blue Shield of Michigan vs. Hoechst | Case No. 02-72806 US District Court (MDL Docket No. 1278) | Peter Bernstein | Shook Hardy | Expert report and deposition |
| 2001 | Representing Schering in patent litigation over losatidine | | Maxine Graham | Kirkland & Ellis | Expert report and deposition |
| 2001 | Medeva Pharmaceuticals vs. Morton Grove Pharmaceuticals | US District Court Case No. 00 C 1689 | Sri Sankaran | Dorsey & Whitney | Expert report |
| 2002 | Andrx vs. Biovail | | Hal Shaftel | Solomon, Zauderer, Ellenhorn, Frischer & Sharp | Expert report and deposition |
| 2004 | Twin City Bakers vs. Biovail | | | Kaplan, Fox & Kilsheimer | Expert report |
| 2004 | Santarus vs. TAP | Arbitration case | Diana Hsu and James Hurst | Winston & Strawn | Expert report and testified at hearing |
| 2005-2006 | Ferndale vs. Veracity Pharmaceuticals | US District Court Case No. 04-72900 | Laurie Michelson | Butzel Long | Expert report |
| 2005-2006 | US vs. Pharmakon | US District Court Case No. 8:03-CV-1663-T-26MSS | | | Expert report, deposition, testified at trial |
| 2006 | Elan vs. King | Arbitration case | Bronson Bigelow | Jones Day (NY) | Expert report and deposition |
| 2006 | Biovail vs. Anchen | US District Court Case No. SACV 04-1468-JVS (RCx) | Donna Praiss | Hunton & Williams | Declaration and deposition |

| 2006 | Medical Center Pharmacy et al. vs. US Government | US District Court Civil Action No. M0-04-CV-130 | Matthew T. Slimp | Hance, Scarborough, Wright, Woodward & Weisbart | Expert report |
| 2007 | Scott vs. Mylan et al. | CV-2006-111 Div. IV | Clem Trischler | Pietragallo Bosick & Gordon LLP | Expert report |
| 2008 | PDL Biopharma vs. Sun | US District Court Case No. 4:07-cv-11709 | Madison Jellins | Townsend, Townsend and Crew | Prepared declaration |
| 2008 | Eli Lilly and Company vs. Teva Pharmaceuticals USA, Inc. | Civil Action No. 1:06-CV-1017-SEB-JMS | Laura Mozarowski | Finnegan | Declaration, expert report and deposition |